JAMES DOUGHERTY, RESPONDENT, *v.* LEANDER STONE, APPELLANT.

*Statute of frauds— what is a collateral promise—charging goods and rendering a bill—judge's charge.*

In an action brought by James Dougherty against Leander Stone upon the latter's alleged verbal promise to pay Dougherty for certain work and materials, it appeared, upon the trial, that Dougherty knew that the houses for which the work and materials were furnished were owned by Louis M. Mowbray, for whom his father, Anthony Mowbray, was acting as agent; and that Stone was only the custodian of certain moneys which had been advanced by Charles Tiffany to Louis M. Mowbray for the completion of these houses; after the work was done by Dougherty, he charged the goods to Louis M. Mowbray, made out a bill to him and afterwards filed a mechanic's lien against the houses for work done thereon for Louis M. Mowbray.

The promise alleged to have been made by Stone to Dougherty was that Stone would pay for anything put in the houses which was ordered by Anthony Mowbray.

Upon an appeal from a judgment in favor of the plaintiff:

*Held*, that Stone's promise was not an original obligation, but was clearly only collateral to the liability of Louis M. Mowbray.

That where the person to whom the goods were furnished was liable at all, the promise of another person to pay for them was collateral and must be in writing.

That while the charging of the goods and the rendering of the bill to Louis M. Mowbray were not conclusive evidence that Dougherty intended to hold Mowbray, they were facts which were not explained, and which, in connection with the mechanic's lien, showed that Stone's alleged promise was not an original obligation.

That a verdict should have been directed for the defendant.

The court read to the jury from a text-book a statement as to the law where credit was given both to a principal and a surety. The defendant's counsel objected to this, stating that there was no question of a joint obligation in the case, to which the court answered that the proposition was an abstract one, and that if the jury should find that there was no joint contract the proposition would amount to nothing.

*Held*, that, although there was no issue as to a joint obligation, the effect of the charge was to allow the jury to find whether there was such an obligation or not, and then to apply the law stated to the facts found.

That this was an error calculated to mislead the jury.

APPEAL by the defendant Leander Stone from a judgment of the Supreme Court, entered in the office of the clerk of the city and county of New York on the 21st day of December, 1891, upon a verdict for the plaintiff for $1,534.57, rendered on a trial at the New York Circuit before the court and a jury; and also from an

order of the same court, entered in the same clerk's office on the 18th day of December, 1891, denying a motion for a new trial made upon the minutes of the court.

The action was brought upon an alleged verbal promise made by Leander Stone to James Dougherty that Stone would pay Dougherty for work, labor and materials furnished by the latter to certain buildings owned by Louis M. Mowbray. The answer alleged that Charles Tiffany had agreed to advance to Mowbray certain moneys to complete the buildings in question, which moneys had been placed in Stone's hands. Upon the trial of the action the court read to the jury the following passage from a text-book relating to the statute of frauds, and its effect upon the rights of a principal surety and third person : "If, however, the credit is given to both (principal and surety) jointly, as neither can be said to be surety for the other to the creditor their enagagement need not be in writing."

*George S. Hamlin*, for the appellant.

*William W. Niles*, for the respondent.

Barrett, J. :

The sole question here is whether the defendant's promise was original or collateral. There are certain undisputed facts which seem to be controlling upon this question — facts testified to by the plaintiff Dougherty himself.

It appears from this testimony that Dougherty knew that the title to the houses in which the materials were to be used was in one Louis M. Mowbray. Anthony Mowbray, Louis' father, told Dougherty that a mortgage upon the houses had been foreclosed, and that as he, Anthony (who was formerly the owner), could not take the title in his own name (he being insolvent), they had been put in his son Louis' name. Dougherty negotiated with Anthony Mowbray about estimates and price before he saw the defendant. His testimony on this head is as follows :

"I undertook the work at this place in this way : Mr. Mowbray asked me to go in and measure the houses. I asked him about what he calculated to spend on glass for the houses, the same as I have been doing work for him for years. He said he thought he ought to get it done for $1,500 — $300 a house. I went and measured all the work in the houses at the time, and I told him I would do it for $1,500."

He was also asked whether there was an agreement between himself and Anthony Mowbray — "a talk as to limiting the cost to $1,500 "— to which inquiry he answered as follows :

"A. He said about $1,500; we had a conversation about it; he told me he thought he ought to get glass good enough for $300 a house, and asked me to go in and measure it up, and see if I could do it for that; I told him I could do it for that, all that was there."

Subsequently the following questions were put to him, and the following answers given :

" Q. Had any agreement been made at that time ? (The time here referred to was that of the defendant's alleged promise.) A. He only said he was satisfied with the estimate, and he was in a hurry for the work; that there were people there looking at the houses.

" Q. And you said you would do it for that estimate ? A. Yes, sir."

He also stated, on cross-examination, that *he was employed by Anthony Mowbray on his son's behalf.*

Dougherty made the estimates in Louis Mowbray's name, and he also arranged with Anthony Mowbray that the bill for his work and materials should also be made out to Louis.

Accordingly, he did the work upon the houses, furnished the materials, charged the goods upon his books and made out the bill therefor to Louis. When the work was finished, he took the bill himself to Anthony, who gave him an order on the defendant for $350, which was paid. Subsequently he filed a mechanic's *lien* against the property, in which he stated, under oath, that the name of the person by whom he was employed, and to whom he had furnished the materials, was Louis M. Mowbray.

The defendant came into the matter as a mere custodian of certain moneys which were put into his hands to be disbursed. It appears that, prior to the time of the alleged promise, Louis Mowbray had given a mortgage to one Tiffany with the understanding that the latter was to make advances thereon for the completion of the houses. Tiffany made these advances directly to Louis, who turned the money over to the defendant to be disbursed upon Anthony Mowbray's orders. Dougherty understood all this, and, when the alleged promise was made, he knew just what Stone's position in the matter was. He testified that Anthony Mowbray told him that "Mr. Tiffany

had agreed to loan money enough to finish the houses, and that it was in Mr. Stone's possession," and that he must see Mr. Stone about his pay. And, again, we quote questions and answers:

" Q. Have not you just said that he (Anthony) told you that Mr. Tiffany had advanced money for the completion of the houses which were in Mr. Mowbray, and that that money was in Mr. Stone's hands ? A. Yes, sir.

" Q. *And that you were to be paid out of the moneys in Mr. Stone's hands, advanced by Mr. Tiffany ?* A. *Yes, sir.*"

Dougherty's testimony as to the promise itself was brief: " I asked him (Anthony Mowbray) who was to pay me? He said Leander Stone." Shortly afterwards Stone arrived. Dougherty was introduced to him by Anthony as the man who was going to do the stained glass work, and the promise is said to have been then made. This is the plaintiff's entire testimony with respect to it: " I asked Mr. Stone if I done this work, if he would pay for it ? He said, yes; I will pay for any work you put in those buildings, ordered by Mr. Anthony Mowbray."

It is impossible, upon all the facts, to treat this promise as original. It was clearly collateral to the originul liability of Louis M. Mowbray, and the facts overwhelmingly show that the plaintiff so understood it, and so relied upon it. If Louis Mowbray was liable to the plaintiff, then the promise was necessarily collateral, there being no question of a joint liability. And the rule is well settled that, if the person for whose use the goods are furnished be liable at all, any other promise by a third person to pay that debt must be in writing, otherwise it is void by the statute of frauds. (*Brady* v. *Sackrider*, 1 Sandf., 514; *Dixon* v. *Frazee*, 1 E. D. Smith, 32; *Allen* v. *Scarff*, 1 Hilton, 212; *Matson* v. *Wharam*, 2 T. R., 80; *Bugbee* v. *Kendricken*, 130 Mass., 437; *Cahill* v. *Bigelow*, 18 Pick, 369.) How can it be seriously contended, upon the facts above stated, that it was not contemplated that Louis Mowbray should be liable at all ? The estimates were made out in his name, the goods were charged to him, the bill was rendered to him, and the plaintiff, under oath, asserted that he was employed by and furnished the goods to him.

The charging of the goods and rendering of the bill to Louis are facts which may not, of themselves, be conclusive. All the facts to which we have adverted are undoubtedly susceptible of explanation.

But the trouble is that no sufficient explanation was given. There was no mistake or inadvertence about what was done. The plaintiff says that he charged the goods and made out the bill as he did because Anthony Mowbray told him to do so. This may explain why he did not charge them to Anthony Mowbray, but it does not explain why, if the sole credit was given to the defendant, they should have been charged to either of the Mowbrays. As to the Mechanic's lien there was no attempt at explanation, and it is indeed difficult to see how such an affidavit could be explained away. Instead of weakening the force of the affidavit, the plaintiff strengthened it by showing that it was deliberately made. He testified that when he filed the mechanic's lien he supposed the statement was true, and that he would not have sworn to it if he had not thought so ; that he went to the county clerk's office and got a young man there to draw it up, *and that he furnished all the information upon which the young man acted in preparing the paper.* And he also admits that he made this affidavit after he had received the $350 from the defendant on Anthony Mowbray's written order.

These facts are much stronger against the claim of an original promise than the facts in many of the cases where, notwithstanding absolute expressions of the promisor, the engagement was held to be collateral. (*Matson* v. *Wharem, supra ; Anderson* v. *Hayman,* 1 H. Bl., 120 ; *Dixon* v. *Frazee, supra ; Langdon* v. *Richardson,* 58 Iowa, 610 ; and see Browne on Statute of Frauds [4th ed.], p. 229 ; Wood on Statute of Frauds, § 98, and 2 Parsons on Contracts [7th ed.], p. 11.)

We think, therefore, that the complaint should have been dismissed at the close of the plaintiff's case.

We think, also, that a verdict should have been directed for the defendant when the testimony was all in. Even if there was enough in the terms of the promise, notwithstanding the interpretation placed upon it by the plaintiff's own acts, to justify the denial of the nonsuit, it is quite clear that the plaintiff's testimony, weakened as it was by his acts, could not stand for a moment against the defendant's denial, corroborated as it was with regard to the surrounding circumstances by the Mowbrays. The plaintiff's testimony, as to the expression used by the defendant when the promise was made, does not harmonize with his subsequent acts and statements. And

this testimony should not have been submitted to the jury as against positive denials — denials, too, which were corroborated with regard to important circumstances, without, at least, some plausible or rational explanation of these subsequent acts and statements. For all such acts and statements plainly indicated that the plaintiff must have understood the defendant's promise to be collateral to the original liability of Louis M. Mowbray.

It was also error to instruct the jury, as the learned judge did in substance, that the effect of charging the goods and rendering the bill to Louis Mowbray was sought to be neutralized by testimony on the plaintiff's part, that these acts were done under the direction of the *agent of the defendant.* The learned judge here referred to Anthony Mowbray, who was the agent of his son Louis, but not of the defendant. We presume this was an inadvertence, but what was said tended to confuse the jury, and it is not improbable that their strange verdict resulted from some idea that the defendant was himself responsible for the very acts which foreclosed the plaintiff.

There is still another point which should be averted to. What was said about a joint contract was inapplicable to the undisputed facts, and, consequently, a false issue was submitted to the jury. When the learned judge's attention was called (by the defendant's exception) to what he had said as to the law governing a joint obligation, he stated that the proposition already charged was an abstract one. He added that if, on all the evidence, the jury should find that there was no joint contract, then the proposition would amount to nothing. Thus it was left to the jury to decide whether, as matter of fact, there was a joint contract, and if there was, to apply the proposition already stated. This question of a joint contract was not in the case at all, and should not have been submitted to the jury in any form. It should rather have been eliminated from the case entirely, if the jury were to be kept from wandering from the real issue.

The judgment and order denying the motion for a new trial should be reversed and a new trial ordered, with costs to the appellant to abide the event.

VAN BRUNT, P. J., concurred.

Judgment and order reversed and new trial ordered, with costs to the appellant to abide the event.